NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION

DOCKET NO. A-2641-17T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY SIMS, JR.,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

January 4, 2021

APPELLATE DIVISION

Submitted October 19, 2020 – Decided January 4, 2021

Before Judges Rothstadt, Mayer and Susswein (Judge Susswein concurring in part and dissenting in part).

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 14-08-1335.

Joseph E. Krakora, Public Defender, attorney for appellant (Robert Carter Pierce, Designated Counsel, on the briefs).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Maura K. Tully, Assistant Prosecutor, of counsel and on the brief).

    The opinion of the court was delivered by

ROTHSTADT, J.A.D.

1

This appeal requires us to determine as a matter of first impression whether the Supreme Court's holdings in State v. A.G.D., 178 N.J. 56 (2003), and State v. Vincenty, 237 N.J. 122 (2019), requiring that police inform a defendant subject to custodial interrogation of specific charges filed against him before he can waive his Miranda[1] rights, also apply to an interrogee who was arrested and questioned prior to any charges being filed, where the arrest was based upon information developed through an earlier police investigation. As explained in our opinion today, we hold that the same requirement applies because without being correctly informed of the crime for which he was arrested, a defendant cannot knowingly and intelligently waive his right against self-incrimination.

Defendant Anthony Sims, Jr. appeals from his conviction by jury of having committed attempted murder and violating weapons offenses, and from his aggregate fifty-year sentence. On appeal, he argues the following points:

> POINT I
>
> BECAUSE AN ARRESTEE CANNOT KNOWINGLY WAIVE HIS MIRANDA RIGHTS IF THE AUTHORITIES DO NOT EXPLAIN WHY HE IS BEING ARRESTED; IT WAS ERRONEOUS FOR THE TRIAL COURT TO ADMIT [DEFENDANT'S] STATEMENT AT TRIAL.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2641-17T2

POINT II

ALL EVIDENCE OBTAINED FROM THE UNCONSTITUTIONAL QUESTIONING OF [DEFENDANT] MUST BE EXCLUDED AS THE FRUIT OF THE POISONOUS TREE.

POINT III

[DEFENDANT'S] SIXTH AMENDMENT RIGHT TO CONFRONT HIS ACCUSER WAS VIOLATED BY THE TRIAL COURT'S RULING THAT PERMITTED THE STATE TO ADMIT THE VICTIM'S TESTIMONY AT THE WADE HEARING AS SUBSTANTIVE EVIDENCE OF [DEFENDANT'S] GUILT.

POINT IV

BECAUSE THE ADMISSION OF A PRIOR INCONSISTENT STATEMENT DUE TO FEIGNED MEMORY IS ONLY ADMISSIBLE IF THE WITNESS FEIGNS A LOSS OF MEMORY IN FRONT OF THE JURY; IT WAS ERRONEOUS FOR THE TRIAL COURT TO ADMIT THE VICTIM'S WADE HEARING TESTIMONY AT TRIAL, WHICH INCLUDED HIS PRIOR STATEMENT TO THE POLICE.

POINT V

THE PROSECUTOR COMMITTED MISCONDUCT AT THE END OF HER SUMMATION BY STATING THAT "YOU CAN HOLD [DEFENDANT] ACCOUNTABLE FOR TAKING THAT COMMUNITY, THAT NEIGHBORHOOD, AND TURNING IT INTO HIS OWN PERSONAL CRIME

3

SCENE (BY RENDERING A GUILTY VERDICT)."
(NOT RAISED BELOW).

POINT VI

THE SENTENCE IMPOSED WAS MANIFESTLY
EXCESSIVE.

Having considered defendant's contentions in light of the record and the applicable principles of law, we reverse the denial of his motion to suppress his statement because defendant was not properly advised of the status of the charges against him prior to his interrogation. We also conclude that the trial court erred by admitting the victim's statement to police through hearsay testimony as defendant was deprived of a meaningful opportunity to challenge the victim's statement at a pretrial hearing or before the jury.

I.

The facts pertinent to this appeal as derived from the trial record are summarized as follows. On April 9, 2014, a man was struck by twelve bullets while sitting in his car in his grandmother's driveway at her home in Red Bank. The victim's grandmother heard the shots followed by her grandson calling for her to help.

The grandmother ran outside and found the victim partially hanging out of the passenger side of his vehicle and bleeding profusely. She asked him,

4

A-2641-17T2

"Who did this to you?" He answered, "Sims." She asked, "Who is Sims?" He answered, "BJ's brother." She knew BJ by his name, R.P., as he and her grandson had been childhood friends and had spent many nights at her house.[2]

Red Bank Police Department (RBPD) Patrolman Benjamin Springer responded to the scene and provided emergency medical assistance to the victim, who was conscious but appeared to be going into shock. Lieutenant Robert Clayton of the RBPD arrived soon after and asked the victim, who the officer had known for fifteen years, to tell him who had shot him. The victim put his face down toward the ground, said he did not know, and did not answer further even though his grandmother encouraged him to respond. His grandmother then told Clayton that the victim had said it was one of BJ's brothers.[3]

Emergency medical personnel soon arrived and transported the victim to the hospital where he was treated for his life-threatening wounds. After undergoing several surgeries and spending a number of days in the intensive care unit, the victim was released from the hospital on April 30, 2014.

---

[2] Defendant's brother R.P. ("BJ") was dead at the time of defendant's trial and the victim here was charged with his murder. The trial court prevented the jury from learning about that fact at defendant's trial.

[3] Clayton knew defendant had an older brother named R.P. and a younger brother named C.S. Clayton had not seen C.S. in about three years, but he believed C.S. and defendant "look[ed] alike."

A-2641-17T2

Prior to the victim leaving the hospital, RBPD Detective Robert Campanella and Monmouth County Prosecutor's Detective Brian Weisbrot interviewed him for almost three hours on April 13. According to Weisbrot, the victim was "scared" but agreed to give a statement. He required pain medication throughout the interview. Nevertheless, during the interview the victim was "cooperative," "alert, oriented, and in control" and eventually identified a photo of defendant and signed the back, confirming it was defendant who had shot him. The victim also signed a copy of his statement that had been typed up while he spoke to the detectives.

In his April 13 statement, the victim recalled sitting in his blue Chevy Camaro in his grandmother's driveway talking on the phone to his friend E.R. when he noticed a man to his left crouched down holding a "black semi-automatic" and pointing it at him. The gunman fired "three or four" bullets through the driver's window. The victim remembered telling E.R. as it was happening to call the police.

The victim also said "[t]he minute I looked at [the gunman] I knew what it was, and I knew who it was, [defendant,] Anthony Sims, Jr." The victim said he had "always known [defendant] through [defendant's] brother BJ." He described defendant as a "[b]lack guy" with a "medium" build who stood "about

5-8 or 5-9." "He was wearing a dark sweatshirt with his hoodie up. The hood was pulled tight but [the victim] could immediately recognize him." When asked if he knew why defendant had shot him, the victim answered: "Yeah, me and BJ had a falling out, and me and BJ were supposed to fight. BJ and [defendant] are brothers." The victim then identified the photo of defendant. He also said that defendant had a girlfriend named A.M.

The next day, Weisbrot and Campanella arrested defendant. According to Campanella, he and Weisbrot "advised [defendant that] he was being placed under arrest." The officers "secured him in handcuffs, patted him down, and told him [he] would be transport[ed]" to an Asbury Park satellite office. They did not advise defendant why they were arresting him or about any charges filed against him.

Defendant asked why he was under arrest, and Campanella told him they "would get into the details" when they got to the Asbury Park office. According to the detective, "at this point in time," "[n]o specific charges" had been filed against defendant, but he had been placed under arrest. No further discussions occurred during the drive to the office. When they arrived at the satellite office, defendant was placed in an interview room with a video recording device. Using a <u>Miranda</u> form, the officers advised defendant of his rights, and he initialed

each page and signed the form agreeing to waive them. According to Campanella, when defendant was arrested and asked to waive his rights, the officers did not tell him that he was arrested for attempted murder.

As defendant was going through the form, Weisbrot told defendant he was "under arrest for assault. I'm sure you have a ton of questions. I'll be happy to get into all that, okay, in just a few minutes. Let's just finish this form. Okay?" After the form was completed, there were no additional conversations during the interrogation about the potential charges against him. Defendant proceeded to answer the detectives' questions.

In his statement, defendant told the officers that he lived in Long Branch with his mother and that he had a five-year-old daughter with A.M., who lived in Neptune. He did not drive, so his mother and A.M. gave him rides. A.M. drove a blue Ford Explorer. He also confirmed that he had two brothers, R.P. who was known as BJ, and C.S.

Defendant denied having any "type of issue" with anyone from Red Bank. He denied knowing anything about "an incident" in Red Bank, but then said that he had read a newspaper article regarding the recent shooting of the victim. Defendant denied knowing the victim and anyone in his family, but then he admitted that he knew him by his first name but had not known his last name.

A-2641-17T2

He described the victim as a "tall guy" with a complexion similar to his own. Without identifying the victim's brother, Weisbrot asked: "What about [the victim's] brother?" and defendant answered: "I don't really see him. He's not really around." Defendant denied having any kind of relationship with the victim or his brother but said he knew them "from being in the projects."

When asked if defendant's brother C.S. was "involved with them," defendant answered that his brother "never really came outside too much to be involved in the activities that I was involved in." Defendant denied knowing anything about an issue that anyone in his family may have had with the victim and specifically denied knowing that BJ and the victim had a falling out. He said BJ would have shared that type of information with him.

After some time, Weisbrot and Campanella told defendant that they knew he had been in Red Bank at the time of the shooting because he was recorded on camera. Defendant continued to deny that he was there or that he knew anything about the shooting.

Eventually, defendant asked to make a phone call using his cellular phone, which the officers allowed him to do. After the call, the police seized defendant's phone.

Thereafter, the police conducted a further investigation of the shooting. The officers reviewed surveillance video from the area that depicted the entire event. They also interviewed several witnesses, who placed defendant at the scene of the shooting or were able to describe the person they saw at the scene at or about the time of the shooting. Police also confirmed that A.M. owned a 2005 dark blue Ford Explorer with no front license plate, which was similar to the vehicle the videos depicted the shooter entering after he fled the scene. They attempted to speak with her numerous times, but she was "completely uncooperative." Also, using defendant's cell phone and phone records, they were able to confirm that he was in Red Bank at or about the time of the shooting.

A grand jury later returned an indictment charging defendant with the attempted murder of The victim with a firearm, N.J.S.A. 2C:5-1, N.J.S.A. 2C:11-3, N.J.S.A. 2C:43-6(c) (count one); the unlawful possession of a weapon by a person having been previously convicted of attempted manslaughter, N.J.S.A. 2C:39-5(b) and N.J.S.A. 2C:39-5(f) (count two); the possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three); and committing the offense of certain persons not to have a weapon, N.J.S.A. 2C:39-7(b)(1) (count four).

Before trial, defendant filed several motions, including one under Miranda to suppress his custodial statement to police and another under Wade/Henderson[4] to bar admission of the victim's out-of-court identification of defendant that he made while hospitalized. After conducting a hearing, at which the victim testified that he could not recall making a statement or identifying defendant to police, on June 23, 2016, the court denied defendant's motion to suppress the victim's out-of-court identification.

As to defendant's statement to police, defense counsel argued that suppression of defendant's statement was warranted because: (1) the officers failed to determine whether defendant had an attorney, even though they knew that he was on parole; and (2) over a two-and-one-half-hour period of questioning, they used deceptive tactics regarding the facts and the basis for his arrest. Counsel did not specifically argue, as defendant does on appeal, that suppression was warranted because the officers did not notify defendant of the potential charges against him that served as the bases for his arrest.

On January 30, 2017, after conducting a hearing, the trial court denied the motion. It found that defendant had knowingly and intelligently waived his

---

[4] United States v. Wade, 388 U.S. 218 (1976); State v. Henderson, 208 N.J. 208 (2011).

A-2641-17T2

<u>Miranda</u> rights and defendant had provided no evidence that the officers' "conduct was overbearing," that their questioning was "threatening," or that defendant had asked them to stop questioning him and they refused.

On June 6, 2017, just before trial began, the State notified the court that the victim would likely invoke the Fifth Amendment privilege against self-incrimination and refuse to testify. At that time, the victim was incarcerated and awaiting trial for the murder of defendant's brother, R.P. The court ruled that if the victim refused to testify, it would admit as evidence the victim's hearing testimony under Rule 804(b)(1)(A) (prior testimony of an unavailable witness).

During the trial, outside the presence of the jury, the victim asserted his Fifth Amendment rights and refused to testify. The trial court declared the victim to be unavailable and allowed Weisbrot to testify about the victim's statement to police while he was hospitalized. The prosecutor also played the video recording of defendant's statement to the detectives for the jury. Defendant did not testify. During its deliberations, the jury requested a read back of Weisbrot's testimony about the statement the victim gave while hospitalized.

Soon after the read back, on July 11, 2017, the jury returned a guilty verdict on counts one through three. Later, on July 24, 2017, the court granted

12

A-2641-17T2

the State's motion to dismiss count four of the indictment (the certain persons offense).  Defendant filed a motion for a new trial, claiming that the victim's out-of-court identification testimony violated defendant's right to confront witnesses and resulted in manifest injustice.  On August 18, 2017, the court denied the motion and imposed its sentence.  This appeal followed.

## II.

We turn first to defendant's contentions in Points I and II of his brief that under the Supreme Court's holdings in State v. A.G.D. and State v. Vincenty, the trial court erred in denying his motion to suppress his statement because the officers failed to advise him that he was arrested for attempted murder.  He contends this omission rendered his waiver unknowing and unintelligent, and any evidence obtained from his statement inadmissible as "fruit of the poisonous tree."  It is undisputed that these arguments were not raised before the trial court.

Because defendant did not raise this argument before the trial court, we review his challenge under the plain error standard.  R. 2:10-2; State v. Funderburg, 225 N.J. 66, 79 (2016).  Generally, we decline to consider questions not properly presented to the trial court.  State v. Witt, 223 N.J. 409, 419 (2015).  "For sound jurisprudential reasons, with few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial

13

court when an opportunity for such a presentation is available.'" Ibid. (quoting State v. Robinson, 200 N.J. 1, 20 (2009)). Yet, "our appellate courts retain the inherent authority to 'notice plain error not brought to the attention of the trial court[,]' provided it is 'in the interests of justice' to do so." Robinson, 200 N.J. at 20 (alteration in original). We are satisfied it is in the interests of justice to address defendant's arguments, and therefore we review the trial court's decision for plain error.

"Plain error is [an] 'error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.'" State v. Timmendequas, 161 N.J. 515, 576–77 (1999) (quoting State v. Irving, 114 N.J. 427, 444 (1989)). A reversal based on plain error requires us first to find an error capable of producing an unjust result and second that the likelihood the error caused an unjust result is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). We will, therefore, disregard the error "unless it is of such a nature as to have been clearly capable of producing an unjust result." Funderburg, 225 N.J. at 79 (quoting R. 2:10-2) (citing State v. Robinson, 165

N.J. 32, 47 (2000)).  "The mere possibility of an unjust result is not enough" to warrant relief.  Ibid. (citing State v. Jordan, 147 N.J. 409, 422 (1997)).

When we review a trial court's decision on a motion to suppress a statement, we generally defer to the factual findings of the motion court when they are supported by credible evidence in the record.  State v. Tillery, 238 N.J. 293, 314 (2019); Vincenty, 237 N.J. at 131–32.  Deference to a trial court's factual findings is appropriate "because the trial court has the 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'"  State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)).  Deference is required even if the trial court's factual findings "are based solely on its review of a video recording."  Id. at 386.  However, we review de novo the trial court's legal conclusions that flow from established facts.  Tillery, 238 N.J. at 314.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503."  S.S., 229 N.J. at 381–82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)).  In determining whether a defendant's incriminating statement is inadmissible, "the prosecution [must] 'prove beyond a reasonable doubt that the suspect's

waiver [of rights] was knowing, intelligent, and voluntary.'" State v. A.M., 237 N.J. 384, 397 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)). See also Miranda, 384 U.S. at 444 (explaining a suspect may waive rights so long as waiver is made knowingly, intelligently, and voluntarily).

A court evaluates whether the State has satisfied its burden by considering the "totality of the circumstances." A.M., 237 N.J. at 398 (citing Presha, 163 N.J. at 313). Under the totality of the circumstances analysis, a court considers factors such as the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." Ibid. (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

In order to make a knowing and intelligent waiver of the right to remain silent, a defendant must have been advised of the nature of the charges being brought against him. Vincenty, 237 N.J. at 132–34; A.G.D., 178 N.J. at 68. In A.G.D., the Court held that a defendant's waiver of Miranda rights is invalid when the police fail to inform the defendant that a criminal complaint has been filed, or arrest warrant has been issued, against him or her. 178 N.J. at 58–59. There, the Court explained:

> a criminal complaint and arrest warrant signify that a
> veil of suspicion is about to be draped on the person,

16

heightening his risk of criminal liability. Without advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission.

[Id. at 68 (emphasis added).]

In Vincenty, the Court reiterated its adherence to A.G.D. and held that interrogating officers must not only inform a suspect that an arrest warrant or complaint has been issued or filed but must also notify the suspect of the charges. 237 N.J. at 126. In its opinion, the Court explained that to ensure a defendant makes a knowing and intelligent waiver of the right against self-incrimination, A.G.D. requires

law enforcement officials to make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges filed against him. That information should not be woven into accusatory questions posed during the interview. The State may choose to notify defendants immediately before or after administering Miranda warnings, so long as defendants are aware of the charges pending against them before they are asked to waive the right to self-incrimination.

[Id. at 134.]

The Court also noted that an interrogating officer's failure to properly advise a defendant of the charges being pursued against him will not be

17

considered harmless error where "[s]ome of [his] statements could be fairly characterized as inculpatory." Id. at 136.

However, in State v. Nyhammer, where the subject of an interrogation was only a suspect who agreed to go to the police station to discuss an investigation into a third party's conduct, and no charges had been filed against him prior to giving his statement, 396 N.J. Super. 72, 79 (App. Div. 2007), rev'd 197 N.J. 383 (2009), there was no need to advise the subject about the charges that he was believed to have committed. Nyhammer, 197 N.J. at 388. As the Court found, police advised the defendant of his Miranda rights an hour before questioning began, he "knew that he was a suspect as soon as the police asked him the first question about his involvement in the sexual abuse of the child-victim," and, "despite having been given his Miranda warnings, he knowingly and voluntarily chose to speak." Ibid.

The Nyhammer Court also explained that "[o]nly in the most limited circumstances have we applied a per se rule to decide whether a defendant knowingly and voluntarily waived Miranda rights." 197 N.J. at 403. One of those circumstances occurred in A.G.D. Id. at 404. The Court explained in A.G.D. that it held "a Miranda waiver per se invalid when the police who were questioning the defendant withheld from him the fact that they had in hand a

criminal complaint and warrant for his arrest." Ibid. (citing A.G.D., 178 N.J. at 68).

Distinguishing between a mere suspect and a suspect that had been charged on an arrest warrant, the Court also explained, "[t]he issuance of a criminal complaint and arrest warrant by a judge is an objectively verifiable and distinctive step, a bright line, when the forces of the state stand arrayed against the individual." Ibid. As the Court highlighted, "[t]he defendant in A.G.D. was purposely kept in the dark by his interlocutors of this indispensable information." Id. at 404–05. Thus, A.G.D. created a bright-line rule requiring law enforcement to advise a person prior to waiver that he or she has been charged with a crime by complaint or warrant, unless the suspect otherwise knows that fact. Ibid.

As to an individual who is merely a suspect, the Court stated the following in distinguishing Nyhammer from A.G.D.:

> Unlike the issuance of a criminal complaint or arrest warrant, suspect status is not an objectively verifiable and discrete fact, but rather an elusive concept that will vary depending on subjective considerations of different police officers. A suspect to one police officer may be a person of interest to another officer. Moreover, we emphasized that "[o]ur holding [in A.G.D.] is not to be construed as altering existing case law . . . other than imposing the basic requirement to

A-2641-17T2

> inform an interrogatee that a criminal complaint or arrest warrant has been filed or issued."
>
> [Id. at 405 (alterations in original) (emphasis added) (quoting A.G.D., 178 N.J. at 68–69).]

Our Supreme Court has said that A.G.D., along with State v. Reed, 133 N.J. 237, 269 (1993) (requiring police to notify a person that an attorney is available for advice), confirmed that "police officers conducting a custodial interrogation cannot withhold essential information necessary for the exercise of the privilege." State v. O'Neill, 193 N.J. 148, 179 (2007). With respect to A.G.D., the O'Neill Court reiterated that the police must disclose to the suspect prior to any questioning that a complaint or warrant has been filed or issued. Id. at 179–80. Failure to do so denies the person of "information indispensable to a knowing and intelligent waiver." Id. at 179 (quoting A.G.D., 178 N.J. at 68).

In State v. Henderson, we rejected the defendant's argument that, under A.G.D., his waiver was not made knowingly "because he was not specifically informed that a warrant for his arrest for the murder of [the victim] had been issued." 397 N.J. Super. 398, 403 (App. Div. 2008), aff'd as modified 208 N.J. 208 (2011). We rejected this argument because "the police advised defendant that they had a warrant for his arrest and told him that he was being taken to the homicide unit." Id. at 404. In that case, "although the police did not tell

defendant that he had been arrested for . . . murder . . . defendant responded that he knew 'what it's all about.'" Ibid. Under those circumstances, we explained that "[w]e decline the invitation to hold that the principles announced in A.G.D. extend to also informing an accused of the basis for the arrest warrant, particularly, as here, when defendant well-understood why he was arrested." Ibid.

The Henderson court found the statement was admissible under A.G.D. because the police had notified the defendant that a warrant for his arrest had been issued. Ibid. We rejected Henderson's argument that the police must also notify the suspect of the specific crime charged, but we did not conclude that police have no duty to inform the suspect that the complaint or warrant has been filed or issued charging the defendant with a crime. Ibid. Moreover, following Henderson, the Vincenty Court clarified that A.G.D. required police to notify the suspect of the basis for the warrant or complaint at the outset of an interrogation. Vincenty, 237 N.J. at 134–35.

Here, it is undisputed that defendant was not merely a suspect at the time of his questioning, as he had been placed under arrest. Moreover, not only did the interrogating officers not tell defendant the charges for which he was arrested, but they admitted to intentionally misleading defendant by advising

21                                                                    A-2641-17T2

him he was arrested for assault—a much lesser offense than attempted murder. That untruthful information did not satisfy the requirements of A.G.D. and Vincenty because, under those cases, a defendant must be advised of the "actual" and "specific" charges he is facing. Id. at 135.

Defendant's arrest, more so than a filed complaint, "signif[ied] that a veil of suspicion [was] draped on [defendant], heightening his risk of criminal liability" for a crime much more serious than an assault. A.G.D., 178 N.J. at 68. Because defendant did not know that he was under arrest for attempted murder when he waived his rights, the waiver was not made knowingly and intelligently. Vincenty, 237 N.J. at 132–34; A.G.D., 178 N.J. at 68. For that reason, we reject the State's contention that it did not matter what defendant was told at the time he was arrested and questioned because defendant was only a suspect and there were no charges filed against him. Once arrested, defendant was entitled to be informed of the charge for which he was being placed under arrest before deciding whether to waive his right against self-incrimination.

It makes no difference whether the charge is an indictable offense stated in a civilian's or law enforcement officer's filed complaint warrant, attesting to facts that establish probable cause to believe the defendant committed the alleged crime, R. 3:2-1(a); R. 3:3-1(a), or if the defendant is arrested without a

warrant based on the officer's probable cause to believe the defendant committed the crime. State v. Brown, 205 N.J. 133, 144 (2011). In the former case, a judicial officer reviews the complaint-warrant and issues an arrest warrant if probable cause is established. R. 3:3-1(a). In the latter case, the officer determines probable cause based on the facts.[5] Brown, 205 N.J. at 144. In either case, a responsible individual determines what charges would warrant an arrest.

Regardless of the process, the analysis for whether a defendant knowingly and intelligently waived the right against self-incrimination is the same. As A.G.D. and Vincenty make clear, a defendant cannot knowingly and intelligently decide to waive the right against self-incrimination unless he or she understands the charges that he or she faces. Vincenty, 237 N.J. at 132–34; A.G.D., 178 N.J. at 68.

---

[5] To be clear, in this case we are only addressing where an officer's probable cause to arrest is developed through an investigation, not when an arrest is made spontaneously when responding to a crime scene or after witnessing a crime being committed. The difference is akin to the Court's treatment of the automobile exception to the warrant requirement described in Witt, where the Court stated, "Going forward, searches on the roadway based on probable cause arising from unforeseeable and spontaneous circumstances are permissible. However, when vehicles are towed and impounded, absent some exigency, a warrant must be secured." 223 N.J. at 450. Our holding today does not address custodial interrogation that occurs after an "unforeseeable and spontaneous" arrest because those facts are not in this case.

Here, because defendant was under arrest, he faced the same risk of self-incrimination as the defendants in A.G.D. and Vincenty. To find that he was not entitled to the same information as those defendants simply because he was arrested without a warrant would contravene both of the Court's holdings.[6]

Moreover, contrary to the State's other contention on appeal, the trial court's error in not suppressing defendant's statement in this matter was not harmless. During the interview, defendant admitted that A.M. was his daughter's mother, that he spent a significant amount of time with her, and that she gave him rides. He described her vehicle, which matched the surveillance recording and description provided by other witnesses, and while he denied being in Red Bank at the time of the shooting, his phone records, which police obtained after seizing his phone during the interview, contradicted defendant's

_____

[6] We do not share our concurring colleague's concern that our holding will create logistical problems for law enforcement. Our opinion is not intended to suggest that the charge upon which an officer believes he or she has probable cause to arrest must be the specific charge with which a defendant is ultimately charged. Rather, our holding is limited to requiring that the interrogating officer inform the arrested interrogee of the charge that, at the time of arrest, the officer had probable cause to believe defendant committed. We recognize that the charge may morph into a different degree crime or even a totally different offense as a post-interrogation investigation develops. We still conclude the law requires an officer be transparent and truthful about why a defendant was arrested before a request is made for a waiver of his or her Miranda rights.

A-2641-17T2

assertion. All of this evidence obtained through the interrogation "could be fairly characterized as inculpatory." Vincenty, 237 N.J. at 136.

Under these circumstances, we are constrained to vacate defendant's conviction and remand for a new trial. We recognize that the trial court did not have an opportunity to consider the issue that we determined warrants a new trial in this case. For that reason, we leave it to the trial court to consider the parties' further arguments and determine pretrial what evidence, in addition to defendant's statement to police, should also be suppressed as "fruit of the poisonous tree" derived from the illegal interrogation, or admitted into evidence despite the taint. See, e.g., State v. Maltese, 222 N.J. 525, 551–52 (2015) (remanding for the trial court to determine whether evidence "discovered directly" from the defendant's illegally obtained confession should be suppressed pursuant to the exclusionary rule); State v. Johnson, 120 N.J. 263, 291 (1990) (addressing the inevitable discovery doctrine).

## III.

We reach a similar conclusion as to defendant's argument in points III and IV of his brief in which he contends the trial court erred by relying upon Rule 804(b)(1)(A) to admit the victim's statement to police through a reading of his testimony from the Wade/Henderson hearing. At the hearing, the victim

A-2641-17T2

testified that he could not recall ever making the statement to police. He later refused to testify at trial. In light of his refusal to testify, the trial court declared the victim unavailable and allowed the State to introduce his statement from the hospital through Detective Weisbrot reading a transcript of the victim's prior testimony from the Wade/Henderson hearing.

Under these circumstances, we conclude it was harmful error to admit the hearsay statement, because defendant did not have an opportunity to cross-examine the victim on his testimonial statement that the trial court allowed the officer to recite for the jury. For that reason, the victim's statement to police while hospitalized cannot be reintroduced at defendant's new trial unless the victim testifies.

## A.

At the pretrial hearing, the victim stated that he did not recall the shooting or the statement he gave to police. Defendant cross-examined the victim at the pretrial hearing about the identification procedures used by the police when speaking with him at the hospital but could not substantively cross-examine him as to the statement the victim gave to police because he could not recall giving the statement. Moreover, even if he did recall giving the statement at the hospital, any questions unrelated to the victim's identification of defendant

would have been outside the scope of permissible cross-examination under Rule 611.

The trial court found that the victim had feigned memory loss at the Wade/Henderson hearing and determined that his statement to the detectives while hospitalized could be admitted under Rule 803(a)(1) as a prior inconsistent statement if the victim testified he could not remember the shooting at trial. The court also recognized that whether the victim had in fact feigned memory loss was a matter for the jury to resolve.

Before the start of trial, the prosecutor notified the court that the victim was not cooperating and would likely invoke the Fifth Amendment and refuse to testify. The court said that if this occurred, it would find the victim "unavailable" under Rule 804(a)(1) and would admit his pretrial hearing testimony pursuant to Rule 804(b)(1)(A). Defendant argued that this would result in a Confrontation Clause violation, but the court rejected the argument finding Rule 804(b)(1)(A) directly applicable.

During trial, but outside the presence of the jury, the court questioned the victim on whether he would testify. The victim invoked his Fifth Amendment privilege against self-incrimination based on the charges he faced for the murder of R.P. The State offered him immunity, and the court ordered him to testify,

27

but he still refused.  The State claimed that because he was already in custody and facing charges for murder, they saw no point in pursuing a contempt charge.  Instead, it requested that the court declare the victim unavailable and allow the State to present his Wade/Henderson testimony through Weisbrot.  Relying on Rule 804(b)(1)(A), the court granted that request.

At the start of Weisbrot's second day of testimony, the court instructed the jury that the victim was alive but unavailable as a witness and that it should not draw any negative inference from his unavailability.  The State then presented the victim's Wade/Henderson hearing testimony by way of the prosecutor reading the questions put to the victim and Weisbrot reading the victim's answers.  That hearing testimony contained the victim's statement to the police that he gave at the hospital.

Specifically, Weisbrot read from the transcript of the victim's testimony from the Wade/Henderson hearing at which the questions asked of the victim in the hospital, as well as his answers to those questions, were read to the victim from the statement he gave to the police.  Weisbrot also read each response the victim gave to the questions at the hearing about whether he recalled giving the recorded answers to the police's questions in the hospital.  Weisbrot's reading of the victim's testimony included the victim's statements on cross-examination

during which defense counsel asked questions about his inability to recall being interviewed by the detectives in the hospital and the procedure by which they had the victim identify a photograph of defendant. In addition, the cross-examination also addressed the victim's criminal history. Through that process, the State was able to introduce into evidence at trial the victim's entire statement to police.

## B.

We review an evidentiary hearsay ruling under the abuse of discretion standard but afford no deference to questions of law, such as those interpreting constitutional rights. State v. McInerney, 450 N.J. Super. 509, 512 (App. Div. 2017).

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution afford an accused in a criminal case the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. These "provisions express a clear preference for the taking of testimony subject to cross-examination." State v. Cabbell, 207 N.J. 311, 328 (2011).

> "One of the essential purposes of cross-examination is to test the reliability of testimony given on direct-examination." State v. Feaster, 184 N.J. 235, 248 (2005) (citations omitted). Indeed, "[w]hen a witness's

A-2641-17T2

> direct testimony concerns a matter at the heart of a defendant's case, the court should strike that testimony if the witness" is unavailable for cross-examination before the same factfinder. See ibid. (citations omitted).
>
> [Id. at 328–29 (alteration in original).]

"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990). "In Craig, the United States Supreme Court outlined four key elements of a defendant's right of confrontation: physical presence; the oath; cross-examination; and observation of demeanor by the trier of fact." State v. Castagna, 187 N.J. 293, 309 (2006).

While the Confrontation Clause expresses a preference for in-court testimony, it does not preclude all forms of hearsay. State ex rel. J.A., 195 N.J. 324, 342 (2008). "Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" State v. Branch, 182 N.J. 338, 357 (2005) (quoting Rule 801(c)). "Hearsay is not admissible except as provided by [the Rules of Evidence] or by other law." N.J.R.E. 802.

The Confrontation Clause prohibits the use of out-of-court testimonial statements when the defendant did not have the opportunity to cross-examine the witness on the statement. J.A., 195 N.J. at 342, 351 (discussing Crawford v. Washington, 541 U.S. 36, 51–52 (2004)). Police statements obtained in furtherance of a criminal investigation are testimonial for purposes of the Confrontation Clause. Id. at 345 (discussing Davis v. Washington, 547 U.S. 813, 822 (2006)).

"The government bears the burden of proving the constitutional admissibility of a statement in response to a Confrontation Clause challenge." State v. Basil, 202 N.J. 570, 596 (2010). Where admission of evidence under a hearsay rule exception results in a Confrontation Clause violation, the evidence must be excluded. See Branch, 182 N.J. at 369–70 ("Crawford . . . is a reminder that even firmly established exceptions to the hearsay rule must bow to the right of confrontation.").

"As Crawford explains, the Confrontation Clause of the United States Constitution bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" State v. Slaughter, 219 N.J. 104, 116–17 (2014) (quoting Crawford, 541 U.S. at 53–54). Where an out-of-

A-2641-17T2

court statement is testimonial for purposes of the Confrontation Clause, the statement may be admissible in evidence "so long as the [witness] is present at trial to defend or explain it." Cabbell, 207 N.J. at 329 (alteration in original) (quoting Crawford, 541 U.S. at 59 n.9). The Court underscored: "One of the key objectives of the Confrontation Clause is to give the 'jury' the opportunity 'to observe the witness's demeanor,'" as it is the jury who decides the defendant's fate. Id. at 330 (quoting United States v. Owens, 484 U.S. 554, 560 (1988)).

Under Rule 804(a)(1), a declarant is "unavailable" if the declarant "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the statement." N.J.R.E. 804(a)(1). Rule 804(b)(1)(A) provides an exception to the hearsay rule where the witness is unavailable and gave testimony "at a prior trial of the same or a different matter, or in a hearing or deposition taken in compliance with law in the same or another proceeding" and that testimony is "offered against a party who had an opportunity and similar motive in the prior trial, hearing or deposition to develop the testimony by examination or cross-examination." N.J.R.E. 804(b)(1)(A).

The bar against permitting hearsay when there has been no opportunity to cross-examine has been applied by our courts when witnesses are deemed "unavailable" because they refuse to testify. For example, in State v. Williams,

32

the State called as a witness Kevin Madison, who had been charged in a separate indictment with the same crimes as Williams. 182 N.J. Super. 427, 430–32 (App. Div. 1982). Madison had given police a statement describing his and Williams's involvement in the crimes. Id. at 430. At the time of Williams's trial, Madison had already been convicted and his case was pending appeal. Ibid.

At a pretrial hearing, Madison invoked the Fifth Amendment and refused to testify at Williams's trial, which prompted the State to grant him immunity. Id. at 430–31. However, Madison continued to assert the Fifth Amendment and refused to answer any questions. Id. at 431.

The State sought to admit Madison's statement to police as a prior inconsistent statement. Ibid. The trial court denied that request, finding the statement hearsay that did not fall within any exception. Ibid. Madison had offered no testimony; thus, his police statement was not a statement inconsistent with trial testimony. Ibid. Moreover, admission of Madison's police statement would deny Williams the constitutional right to cross-examine Madison before the jury. Ibid.

On appeal, we stated the following:

> The statement was not subject to cross-examination when given by Madison. Moreover, defendant will not have an opportunity to cross-examine Madison at trial about the statement because Madison has refused, albeit

A-2641-17T2

without legal justification, to answer any questions put to him. Thus, the Confrontation Clause bars the admission of Madison's statement into evidence at defendant's trial.

[Id. at 438.]

In Cabbell, two defendants were charged in the shooting death of a man who was riding in a car that had collided with the defendants' vehicle. 207 N.J. at 317–19. After the shooting, eyewitness Karine Martin described the accident and shooting to police and identified the defendants as the shooters. Id. at 322.

At trial, the prosecutor called Martin as a witness. Id. at 319. While on the witness stand, she repeatedly said that she did not wish to testify. Ibid. The prosecutor persisted and got her to admit that she was currently in custody for a drug offense and that she had given a truthful statement to police. Ibid. The court then interrupted trial to hold a Rule 104 hearing outside the presence of the jury to determine whether her police statement was reliable and admissible. Ibid.

At the hearing, Martin refused to answer questions until the court informed her of the contempt and jail consequences. Id. at 320. Then, she answered by claiming a lack of memory. Ibid. She admitted, however, that she was on the road of the shooting when the shooting occurred and that her statement to police was truthful. Ibid. On direct examination, Martin claimed

that she was under the influence of crack cocaine at the time of the shooting and when she spoke with police, but on cross-examination she stated that she did not remember whether she had been under the influence at the time of the shooting or subsequent questioning. Ibid. The court determined that Martin's statement to police would be admissible under Rule 803(c)(5) as a past recollection recorded and that she would not be called to testify any further before the jury. Id. at 321 (citing N.J.R.E. 803(c)(5)).

In finding that admission of Martin's statement to police violated Cabbell's right to confront her, the Court explained:

> The Confrontation Clause prohibits the use of a witness's out-of-court testimonial hearsay statement as a substitute for in-court testimony when a defendant has never been given the opportunity to cross-examine the witness. . . . For [C]onfrontation-[C]lause purposes, testimonial statements are those in which witnesses bear testimony against the accused . . . and include certain statements that are the product of police interrogation . . . . More precisely, a statement made to the police is testimonial when it is given in circumstances objectively indicat[ing] that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
>
> [Id. at 329 (third alteration in original) (citations and internal quotation marks omitted).]

In Nyhammer, the Supreme Court approved the admission of a child's videotaped interview in a sexual assault case. 197 N.J. at 389. In approving the tape's admission even though it "constitute[ed] testimonial hearsay for Sixth Amendment purposes," id. at 412, the Court determined that the defendant had not been deprived of his rights under the Confrontation Clause as defense counsel had the opportunity to cross-examine the child at trial but chose not to do so based upon a tactical decision. Id. at 412–14. Here, however, as in Cabbell, the witness, who was the victim, was never presented for cross-examination before the jury. See Cabbell, 207 N.J. at 333.

Here, the State concedes on appeal that the victim's signed statement could not have been admitted at trial as a prior inconsistent statement. But it argues that his testimony was admissible under Rule 804, because the victim was unavailable at trial, and defendant had an opportunity to cross-examine the victim at the Wade/Henderson hearing. Thus, the State contends the victim's statement was admissible under Rule 804 through the prosecutor and Weisbrot's reading of the victim's testimony from the Wade/Henderson hearing. We disagree.

We reject the trial court's reliance on Rule 804(b)(1)(A), because defendant did not have "an opportunity and similar motive in the prior . . .

hearing . . . to develop the testimony by . . . cross-examination." N.J.R.E. 804(b)(1)(A). Due to the victim's claimed lack of memory, defendant did not have an "opportunity" to develop the victim's testimony by cross-examination. See State v. Coder, 198 N.J. 451, 467 (2009) (finding witness "unavailable" at a Rule 104 hearing pursuant to Rule 804(a)(3) where witness claimed lack of memory). Moreover, the purpose of the hearing was limited to the victim's out-of-court identification of defendant. Defendant's purpose in developing the victim's testimony at trial would have been to attack the victim's credibility in the eyes of the factfinder, specifically the veracity of his identification of defendant as the shooter. Defendant did not have the opportunity to do that at the hearing because the victim denied any recollection of the shooting and the police statement. Therefore, admission of the victim's statement under Rule 804(b)(1)(A) was in error.

Independent of this Rule 804 issue, the admission of the victim's statement also ran afoul of defendant's rights under the Confrontation Clause. Defendant did not have the opportunity to cross-examine the victim about his statement to police—either at the pretrial hearing or in front of the jury—which had been admitted because the victim was unavailable by virtue of his feigned memory loss at the hearing and refusal to testify at trial. In so concluding, we find

37

defendant was deprived of both the opportunity to cross-examine the victim and the opportunity to have the trier of fact observe the victim's demeanor on cross-examination. Castagna, 187 N.J. at 309.

To begin with, defendant "did not have 'a prior opportunity to cross-examine' in any real sense," Cabbell, 207 N.J. at 332, at the pretrial hearing because the victim denied any memory of the shooting or of giving his statement identifying defendant. Cf. Coder, 198 N.J. at 466–67. Without any memory as to the statement, there was nothing to cross-examine the victim about at the Rule 104 hearing, and therefore defendant never had a meaningful opportunity to cross-examine the victim.

Moreover, by allowing the statement to be admitted through Weisbrot's testimony, defendant was deprived of the jury being able to assess the victim's demeanor. Contrary to the trial court's acknowledgment that the jury was to determine if the victim's memory loss was feigned, the jury was never given that opportunity. Craig, 497 U.S. at 845 ("[T]he right guaranteed by the Confrontation Clause . . . permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."). "[C]ross-examination would have allowed counsel not only to explore [the victim's] state of mind at the time but also to

probe for bias.  Of great import as well, the jury was deprived of a chance to assess [the victim's] demeanor and credibility."  Slaughter, 219 N.J. at 121. Because defendant never had the opportunity to cross-examine the victim before the factfinder that was to decide his fate, admission of the victim's statement violated his confrontation rights.

In sum, admission of the victim's hearing testimony, which contained his police statement verbatim, violated defendant's right to cross-examine the victim before the jury and should not be admitted again at defendant's new trial.

IV.

Because we have remanded this matter for a new trial, we need not address defendant's remaining arguments relating to the prosecutor's comment during summation or the excessiveness of his sentence.

Reversed and remanded for a new trial.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

_____

**SUSSWEIN, J.A.D., concurring in part and dissenting in part.**

I concur with my colleagues that the statement taken from defendant in this case must be suppressed. I write separately to explain why I believe the per se rule contemplated in section II of the majority opinion, which would require police in some cases to advise a custodial interrogee of charges not yet filed, has the potential to introduce uncertainty to the administration of Miranda[7] warnings.

Applying existing legal principles, the custodial interrogation in this case was conducted unlawfully. The police department and the prosecutor's office jointly investigated a shooting incident in which the victim was seriously injured. The prosecutor's office, which bears ultimate responsibility for making law enforcement charging decisions, participated in—if not oversaw—the investigation, as shown by the active role played by a prosecutor's detective. Detectives conducted a three-hour hospital-bed interview of the victim, which provided ample probable cause to believe defendant had committed attempted murder. The ensuing warrantless arrest was planned, and the detectives who made the arrest and conducted the custodial interrogation declined initially to

_____

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

answer defendant's direct question as to why he was arrested, ostensibly to obtain his waiver of <u>Miranda</u> rights before he realized that he would be facing a charge of attempted murder. As the majority opinion notes, the interrogating officers admitted they intentionally misled defendant by advising him he was arrested for assault, which is a far less serious offense than attempted murder. <u>State v. Sims</u>, __ N.J. Super. __, __ (App. Div. 2020) (slip op. at 21).

Considering the totality of these circumstances, I concur with the majority that the detectives' interrogation stratagem prevented defendant from making an informed decision whether to waive his <u>Miranda</u> rights. There should be no judicial tolerance for interrogation tactics that affirmatively mislead an arrestee as to his legal status. However, I urge caution in creating a new per se <u>Miranda</u> rule that requires police to advise custodial interrogees of the offense(s) for which they were arrested when a complaint-warrant or arrest warrant has not been issued.

The majority opinion builds upon the foundation laid by our Supreme Court's recent decision in <u>State v. Vincenty</u>, 237 N.J. 122 (2019). The Court in that case ruled that law enforcement officers must "make a simple declaratory statement at the outset of [a custodial] interrogation that informs [the arrestee] of the essence of the charges <u>filed against him</u>." <u>Id.</u> at 134 (emphasis added).

2                                                                            A-2641-17T2

The majority today extends the notification rule announced in <u>Vincenty</u>, holding that it can apply even when charges have not been filed against the interrogee and no arrest warrant has been issued.

In doing so, the majority opinion acknowledges that it is resolving a question of first impression. <u>Sims</u>, __ N.J. Super. at __ (slip op. at 2). The per se rule announced today would change current law and longstanding police interrogation practices. Until now, police have not been required to inform a custodial interrogee as to the offense(s) for which he was arrested unless a complaint-warrant or arrest warrant had been issued. To fully appreciate how the majority opinion alters current law, it is helpful to retrace the incremental steps leading to today's decision.

In <u>State v. A.G.D.</u>, our Supreme Court expanded the list of familiar <u>Miranda</u> warnings, holding that a waiver of <u>Miranda</u> rights is invalid when police fail to inform the defendant that a criminal complaint has been filed or an arrest warrant has been issued. 178 N.J. 56, 58–59 (2003). In establishing this bright-line rule, the Court explicitly recognized the critical significance of formal charging, explaining that

> a criminal complaint and arrest warrant signify that a veil of suspicion is about to be draped on the person, heightening his risk of criminal liability. Without advising the suspect of his true status when he does not

A-2641-17T2

otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission.

[Id. at 68.]

In State v. Nyhammer, the Court further acknowledged the significance of formal charging, explaining, "[t]he issuance of a criminal complaint and arrest warrant by a judge is an objectively verifiable and distinctive step, a bright line, when the forces of the state stand arrayed against the individual." 197 N.J. 383, 404 (2009). The Supreme Court in Nyhammer took pains to explain the limited scope of its earlier ruling in A.G.D.:

> Moreover, we emphasized that "[o]ur holding [in A.G.D.] is not to be construed as altering existing case law . . . other than imposing the basic requirement to inform an interrogatee that a criminal complaint or arrest warrant has been filed or issued."
>
> [Id. at 405 (alterations in original) (emphasis added) (quoting A.G.D., 178 N.J. at 68–69).]

In Vincenty, the Court expounded upon A.G.D., explicitly requiring police to not only advise the arrestee of the fact that a criminal complaint or arrest warrant has been issued but also to provide a "simple declaratory statement" as to the charges filed against him. 237 N.J. at 134. Under the A.G.D./Vincenty rule, police interrogators know with objective certainty not

4

only when this notification requirement is triggered—a complaint-warrant or arrest warrant has been issued—but also know with objective certainty what they are required to disclose, namely, the offense(s) that are specified in the complaint-warrant.

We should be careful not to transform this simple prophylactic rule into an unnecessarily complex one. The Supreme Court's repeated references in A.G.D., Nyhammer, and Vincenty to charges that have been filed and warrants that have been issued are not superfluous dicta. Rather, in my view, the "objectively verifiable" nature of judge-issued complaint-warrants and arrest warrants, Nyhammer, 197 N.J. at 404, is an important consideration that supports the rationale for the Supreme Court's holdings in A.G.D and Vincenty.

The underlying premise is that arrestees should be advised of their "true status" before being asked to waive Miranda rights. A.G.D., 178 N.J. at 68. When a complaint-warrant or arrest warrant is issued by a judge, there is no ambiguity as to the essential nature and gradation of the charge(s) the defendant is facing because the specific offense(s) for which a judge found probable cause are set forth in the charging document. See R. 3:2-1(a)(1) ("The complaint shall be a written statement of the essential facts constituting the offense charged . . . ."). The specificity of a complaint-warrant thus makes it possible

for police to provide a "simple declaratory statement" to inform an interrogee accurately and definitively as to the nature and seriousness of the charges that have been filed as of the time of a custodial interrogation.[8]

The assessment of an arrestee's "true status" can become more complicated when charges have not been approved by a judge. To be sure, arresting officers must have probable cause to believe an offense has been or is being committed before making an arrest, or else the arrest is unlawful. It is possible, however, for an officer to have a lawful basis for an arrest but insufficient information, pending further investigation, to determine which exact offense(s) have been committed. Even when probable cause was developed in the course of an investigation, as contemplated in the majority opinion, there still may be reasonable disagreement as to what specific offenses were committed and thus which ones should be included in an application for a complaint-warrant. The number and gradation of offenses has a significant impact on a defendant's sentencing exposure, and thus directly impacts his "true status" within the meaning of A.G.D.

---

[8] The arrestee's "true status" refers to the status at the time of the custodial interrogation. See A.G.D., 178 N.J. at 68. Obviously, initial charges set forth in a complaint-warrant can be amended. A grand jury, for example, may add to or delete charges that were initially filed by complaint-warrant.

6

Consider, by way of example, that when a defendant is arrested for unlawful possession of controlled dangerous substances, police at the outset of an interrogation may not have sufficient information to determine whether the defendant committed the offense of simple possession, N.J.S.A. 2C:35-10, or the more serious offense of possession with intent to distribute, N.J.S.A. 2C:35-5(a). Even in the case of a planned arrest pursuant to an investigation of drug trafficking, detectives conducting a custodial interrogation may not be in a position to know whether the defendant committed a first, second, or third-degree drug distribution/possession with intent crime, which depends on the aggregate amount of drugs involved, N.J.S.A. 2C:35-5(c), conspiracy, N.J.S.A. 2C:5-2, or even—in rare cases—leading a narcotics trafficking network, N.J.S.A. 2C:35-3.

Likewise, when an arrest is made for assault, the interrogating officer may lack sufficient medical information to determine whether the victim suffered bodily injury, significant bodily injury, or serious bodily injury, N.J.S.A. 2C:11-1(a), (d), (b), which can determine whether the arrestee committed simple assault or the far more serious crime of aggravated assault. In the same vein, an interrogating officer may not have sufficient information concerning the

A-2641-17T2

arrestee's culpable mental state to decide at the outset of the interrogation whether the defendant committed the specific-intent crime of attempted murder.[9]

I list only a few examples of the myriad situations where an arrest and ensuing custodial interrogation may be initiated before police have sufficient information to determine the seriousness and statutory gradation of the suspected offense conduct. In these situations, extending the bright-line rule established in Vincenty could put the proverbial cart before the horse by requiring a police officer to advise the custodial interrogee as to the specific charges he is facing before an informed charging decision can be made. When that happens, the officer may not be able to accurately advise the arrestee as to his "true status" within the meaning of the A.G.D./Vincenty rule because that status may be in flux.

It bears noting, moreover, that the officer who conducts the custodial interrogation may not be the law enforcement official who decides which offense(s) will be included in the ensuing complaint-warrant application that must be made before the arrestee is released or is held pending a pretrial

---

[9] There is no such ambiguity in this case given the execution-style nature of the shooting and the life-threatening injuries that were suffered. Furthermore, the arresting detectives had already determined the retaliatory motivation for the shooting.

detention hearing.[10] The complaint review and approval process prescribed in the Attorney General's CJRA Directive may reduce or expand the number of charges contemplated by the interrogating officer, or may upgrade or downgrade those charges.

Consequently, requiring an interrogating officer to advise an arrestee as to specific charges that have not yet been approved may, in some cases, misinform the arrestee as to his predicament. Moreover, because we are treading on new and untested ground,[11] our opinion today can offer no guidance on how a reviewing court should address variance between the unfiled charges now required to be announced to the interrogee and the charges set forth in a complaint-warrant issued shortly after the custodial interrogation. Such variance might inject new fact-sensitive issues to be litigated at suppression

---

[10] To ensure the uniform implementation of the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26, in October 2016, the Attorney General issued a directive to law enforcement that generally provides that applications for complaint-warrants involving indictable crimes must be reviewed and approved by an assistant prosecutor or deputy attorney general before being submitted to a judge. See Attorney General, Law Enforcement Directive No. 2016-1, §§ 3.1 to 3.6 (CJRA Directive).

[11] As previously noted, the majority opinion addresses an issue of first impression under New Jersey law. Neither the briefs submitted by the parties nor the majority opinion cite to federal or other state precedents that embrace the new rule announced today.

A-2641-17T2

hearings when defendants challenge the accuracy of the charge-related information that police disclosed during the <u>Miranda</u> waiver colloquy pursuant to the new rule announced today.

A per se rule requiring notification of charges not yet filed may create additional uncertainties when, for example, a defendant is arrested for one criminal incident but also is suspected of committing other uncharged crimes. Consider a situation where a burglar is caught red-handed in a home and also suspected of committing a rash of other residential burglaries for which the proofs are less compelling. It is not clear under the rule announced today whether an interrogating detective must tell the arrestee he is suspected of—and likely to be charged with—committing those other burglaries. New questions will arise under this new paradigm. For example, must the interrogating officer decide whether, in view of the latest episode, there is now probable cause to believe that the defendant committed some or all of those other burglaries? If probable cause for those other criminal events has, in the officer's opinion, ripened as a result of the suspect's latest offense, must the officer so advise the arrestee before conducting the custodial interrogation?

The <u>A.G.D.</u>/<u>Vincenty</u> rule, as it presently stands, avoids the need to answer such subjective questions by relying on what the Supreme Court in

Nyhammer described as an "objectively verifiable and discrete fact," that is, the issuance of a complaint-warrant or arrest warrant. 197 N.J. at 405. I believe that as a general proposition, any per se rule that expands the list of Miranda warnings/advisements should be unambiguous, relying on objectively verifiable and discrete facts so that police know precisely what they are required to disclose to the interrogee.[12] Indeed, the whole point of a "bright line" rule is to draw clear, unambiguous lines of demarcation. Under the new rule we announce today, the declaratory statement that police will be required to make at the outset of a custodial interrogation may not be as simple as the one contemplated in Vincenty. 237 N.J. at 134. Rather, the determination of a defendant's "true status," that is, a determination as to what charges he is facing, may well be, to borrow phraseology from Nyhammer, a more "elusive concept that will vary depending on subjective considerations of different police officers." 197 N.J. at

---

[12] Our Supreme Court also expanded the list of Miranda advisements in State v. Reed, 133 N.J. 237 (1993). The Court held that, "[w]hen, to the knowledge of the police, . . . an attorney is present or available, and the attorney has communicated a desire to confer with the suspect, the police must make that information known to the suspect before custodial interrogation can proceed or continue." Id. at 261–62. The fact that an attorney is present at the police station or is available and has asked to confer with an arrestee is an objectively verifiable and discrete circumstance that can be relayed accurately to the arrestee through a simple declaratory statement.

A-2641-17T2

405 (explaining that police are not required to inform persons of their "suspect status" because "suspect status is not an objectively verifiable and discrete fact."). It bears noting in this regard that the provisions in the Attorney General's CJRA Directive that require prosecutorial review and oversight of the complaint-warrant application process presuppose that law enforcement officials can disagree as to the appropriate charges.

One of the hallmarks of Miranda and its progeny is that the familiar five-fold[13] warnings/advisements are essentially scripted. They are not tailored based on subjective determinations made by interrogating officers. For the foregoing reasons, the majority's extension of the A.G.D./Vincenty rule might introduce

---

[13] As explained in State v. Tillery:

> In Miranda, the United States Supreme Court held that before law enforcement subjects a suspect to custodial interrogation, the suspect must be advised: (1) "that he has the right to remain silent"; (2) "that anything he says can be used against him in a court of law"; (3) "that he has the right to the presence of an attorney"; and (4) "that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda imposes a fifth requirement: "that a person must be told that he can exercise his rights at any time during the interrogation."
>
> [238 N.J. 293, 315 (2019) (internal citations omitted).]

A-2641-17T2

subjectivity, ambiguity, and uncertainty as to what police are required to tell arrestees before conducting custodial interrogations.

Finally, I would note that it is not clear that the Court in Vincenty intended to lay the groundwork for the significant change to our custodial interrogation jurisprudence that will result from today's opinion. Our Supreme Court knows best whether and to what extent formal charging was essential to its holdings in A.G.D. and Vincenty. Those cases amply demonstrate our Supreme Court's willingness to adopt new rules, practices, and procedures to safeguard the constitutional rights of persons who are subjected to custodial interrogation. See also R. 3:17 (generally requiring electronic recordation of stationhouse interrogations). Without question, a custodial interrogee is better able to make an informed decision whether to waive Miranda rights when he is alerted to the offense(s) for which he was arrested. The challenge is how best to effectuate that basic principle. Given the important ramifications of such a significant change to the Miranda rule, I would leave it to our Supreme Court to consider the costs and benefits and decide whether to dispense with the explicit prerequisite in Vincenty that formal charges have been filed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

13